NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEW JERSEY SAND HILL BAND OF LENAPE & CHEROKEE INDIANS; RONALD-STACEY, *Plaintiffs*, v. | |
| JON CORZINE, *et al.*, *Defendants*. | Civil Action No. 09-683 (KSH) **OPINION** |

**KATHARINE S. HAYDEN**, SENIOR DISTRICT JUDGE.

## I.  INTRODUCTION

The New Jersey Sand Hill Band of Lenape & Cherokee Indians ("Sand Hill Band") and its putative public minister, Ronald S. Holloway, Sr.[1] (collectively, "plaintiffs") instituted this civil action seeking damages as well as injunctive, declaratory, and punitive relief from the defendants, the State of New Jersey, each county therein, and their official representatives (collectively, "defendants").  Stripped to its essence, the plaintiffs' complaint alleges that the defendants and their predecessors have converted and misappropriated their land and other property rights for more than 200 years, in violation of federal constitutional and statutory law. They also claim that the defendants have wrongfully precluded representation on the New Jersey Commission on American Indian Affairs, which is also named as a defendant.  Now pending

---

[1] Though the case caption refers to Ronald-Stacey, the body of the second amended complaint refers to Ronald S. Holloway, Sr.  The Court understands these two identities to be the same person, and for consistency refers only to Holloway.

1

before the Court are the defendants' collective motions to dismiss the Second Amended Complaint ("SAC") pursuant to Federal Rule of Civil Procedure 12(b)(6).  The State Defendants[2] have filed a motion to dismiss [D.E. 97], in which the County Defendants[3] have joined.  (Several of the County Defendants have also submitted letter-briefs asserting county-specific arguments.)  Additionally, the County Defendants have filed their own joint motion to dismiss.  [D.E. 123].

## II.  BACKGROUND

### A.  Factual Background[4]

The Sand Hill Band is a Native American tribal family descending from the Delaware, Raritan, and Unami Indians.  SAC ¶ 1, 19.  From time immemorial, it has owned and occupied approximately 2,000,000 acres of land constituting the present-day State of New Jersey, within

---

[2] As used herein, the "State Defendants" are the State of New Jersey; former New Jersey Governor Jon S. Corzine, in his individual and official capacities; former New Jersey Secretary of State Nina Wells, in her individual and official capacities; former Attorney General Anne Milgram, in her individual and official capacities; New Jersey Senate President, Richard Codey; and the New Jersey Commission on Indian Affairs.  To the extent the individual State Defendants are sued in their official capacities, those defendants are now:  Christopher J. Christie, Governor; Paula T. Dow, Attorney General; and Kim Guadagno, Secretary of State.  *See* Fed. R. Civ. P. 25(d).  The individual State Defendants sued in their personal capacities (Corzine, Wells, and Milgram, and Codey) remain subject to suit to that extent.

[3] As used herein, the "County Defendants" include each of New Jersey's twenty-one counties:  Atlantic; Bergen; Burlington; Camden; Cape May; Cumberland; Essex; Gloucester; Hudson; Hunterdon; Mercer; Middlesex; Monmouth; Morris; Ocean; Passaic; Salem; Somerset; Sussex; Union; and Warren.

[4] The facts are taken from the allegations contained in the SAC and, for purposes of this motion only, are assumed as true.  The Court emphasizes, however, that many of the factual allegations contained in the SAC are in tension with a recent lawsuit in which a different tribal group laid claim to the land at issue here, and another suit pressed by a group with the same name in New Jersey state court.  *See generally Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. Corzine*, __ F.3d __, __, No. 08-2775, 2010 U.S. App. LEXIS 10570 (3d Cir. May 25, 2010); *Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. New Jersey*, 867 A.2d 1222 (N.J. Super. Ct. App. Div. 2005).  Moreover, the plaintiffs' legal claims here appear to be substantially similar, if not identical, to those asserted in these cases.  Nonetheless, the Court recites the historical facts as asserted by the plaintiffs.  The Court further notes that the authenticity of the plaintiffs' tribal membership is a factual issue subject to fierce debate.  *See, e.g.*, Joe Ryan, *Indian feud, 21 counties, a big lawsuit*, NJ.com (March 22, 2009) (last visited June 24, 2010) (on file with the Court) (chronicling the filing of this lawsuit, the competing claims between two groups calling themselves Sand Hill Indians, and stating that competing group "accuse[s] [Holloway] of hijacking their heritage to try to extract money from the government"); D.E. 167 (May 6, 2010 letter to the Court alleging that "Holloway is not a Sand Hill Indian," and "is not known to anyone in our Sand Hill family").

which formerly lay the Brotherton Indian Reservation, and which presently constitutes Shamong Township, Burlington County, New Jersey.  *Id.* ¶¶ 1, 19, 62.  Holloway is a member of the Sand Hill Band and a descendant from its original landowners.  *Id.* ¶ 19.  The Sand Hill Band is not an Indian tribe formally recognized by the federal government.

The plaintiffs allege that in the 1700s, the Sand Hill Band entered into a series of treaties with the British government that conferred upon the tribe the right to possess its land, unless purchased by the United States.  SAC ¶¶ 1, 62.  Related to these dealings, the plaintiffs allege that in 1758, they entered into a treaty (the Treaty of Easton) in which they ceded to the British government some one million acres of land (which passed to the United States at the conclusion of the American Revolution), but that they retained "all rights of hunting, fishing, and like uses of the land."  *Id.* ¶ 64.  In 1790, Congress passed the Trade and Intercourse Act ("Nonintercourse Act" or "NIA"), 1 CONG. CH. 33, 1 STAT. 137 (July 22, 1790), codified at 25 U.S.C. § 177.  In short, the Nonintercourse Act "bars the sale of tribal land without federal government acquiescence."  *Oneida Indian Nation of N.Y. v. Madison County*, __ F.3d __, __, No. 05-6408, 2010 U.S. App. LEXIS 8643, at *7 (2d Cir. Apr. 27, 2010).[5]

_____

[5] The NIA states:

> No purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians, shall be of any validity in law or equity, unless the same be made by treaty or convention entered into pursuant to the Constitution.  Every person who, not being employed under the authority of the United States, attempts to negotiate such treaty or convention, directly or indirectly, or to treat with any such nation or tribe of Indians for title or purchase of any lands by them held or claimed, is liable to a penalty of $1,000.  The agent of any State who may be present at any treaty held with Indians under the authority of the United States, in the presence and with the approbation of the commissioner of the United States appointed to hold the same, may, however, propose to, and adjust with, the Indians the compensation to be made for their claim to lands within such State, which shall be extinguished by treaty.

25 U.S.C. § 177.

Despite the Sand Hill Band's negotiated land rights and the protection of the Nonintercourse Act, the plaintiffs allege that in 1802, the defendants sold the acreage constituting the Brotherton Reservation without the federal government's consent, thus violating the NIA. *See, e.g.*, SAC ¶¶ 1-3, 65, 91, 100, 103, 105, 109.[6] According to the plaintiffs, the sale "illegally deprive[d the Sand Hill Band] of use of the acreage ceded to the British Crown (and thereby to the United States) over which [it] retained hunting, fishing and other use rights, and further . . . deprived [it] of the ownership of its own land." SAC ¶ 65. The plaintiffs variously claim original title to the 3,044 acres of land that formerly made up the Brotherton Reservation and the 2,000,000 acres constituting the entire State of New Jersey. For purposes of this opinion, it is unnecessary to discern the metes and bounds of the lands over which the plaintiffs claim rightful ownership. For simplicity, however, the Court refers herein only to the Brotherton Reservation.

The plaintiffs also allege that the County Defendants have violated the Native American Graves Protection and Repatriation Act of 1990 ("NAGPRA"), PUB. L. 101-601, § 2, 104 STAT. 3048 (Nov. 16, 1990), codified at 25 U.S.C. §§ 3001-3013, because they "are in possession of burial land and artifacts belonging to [the plaintiffs]." SAC ¶¶ 158-63.

Finally, the plaintiffs aver that the State Defendants have acted in concert with the New Jersey Commission of American Indian Affairs to deny the Sand Hill Band representation on the Commission, thereby ensuring that the group does not achieve recognition by the federal Bureau of Indian Affairs ("BIA") as a Native American tribe. SAC ¶¶ 10-11, 111-14. The plaintiffs claim, moreover, that the State Defendants have appointed to the Commission representatives

---

[6] There is some question whether the sale occurred in 1801 or 1802. *Compare* SAC ¶ 1-3 (alleging 1802) *with Unalachtigo Band*, 867 A.2d at 1225 (stating that sale occurred in 1801). The Court refers to 1802, as it appears in the SAC.

from various Indian entities that are not indigenous to the State of New Jersey and have less historical documentation than the Sand Hill Band, which to date has garnered no representation on the Commission.  *Id.* ¶¶ 11, 112-14.

**B.**     **Procedural Background**

On February 17, 2009, the plaintiffs filed an initial complaint (styled a "petition") seeking damages and emergent injunctive relief.  [D.E. 1.]  On February 23, 2009, they filed an amended petition/complaint [D.E. 2], and thereafter filed an application for a temporary restraining order seeking an order enjoining enforcement of certain New Jersey laws and regulations related to their claims.  [D.E. 5.]   The Court denied the  application in an opinion and order issued on March 24, 2009.  [D.E. 14.]  The plaintiffs filed a partial amendment to the amended complaint on April 20, 2009 [D.E.  66], and filed a complete SAC on May 22, 2009 [D.E. 88], which is the subject of the pending motions to dismiss.  The State Defendants moved to dismiss on June 18, 2009 [D.E. 97], a motion which each County Defendant joined.  On July 6, 2009, Magistrate Judge Patty Shwartz ordered that each County Defendant may, in addition to joining the State Defendants' arguments, file its own dispositive motion.  [D.E. 117.]  On July 23, 2009, defendant Salem County filed a motion to dismiss [D.E. 123] on behalf of all County Defendants.  *See* D.E. 123-1 at 2.

**C.**     **Causes of Action**

The SAC asserts fifteen causes of action against the defendants.  Before explaining the factual and legal bases for them, the Court notes that the plaintiffs have withdrawn the following causes of action:  Count 2 (to the extent the SAC asserts claims under 18 U.S.C. § 241), Count 6 (to the extent it asserts claims under 18 U.S.C. § 1170), and Counts 10 and 12 (in their entirety).  *See* Pl. Opp. to State Br. at 15, 16, 27.  Accordingly, those counts are dismissed without further

discussion.  Furthermore, the plaintiffs have taken the explicit position in their brief that the only claim against the County Defendants relates to Count 6, asserted pursuant to the NAGPRA.  *See* Pl. Opp. to County Br. at 2, 12.[7]

In Count 1 of the SAC, the plaintiffs assert that the State Defendants, in their official capacity, conspired to commit, and in fact did commit, acts of fraud, genocide and crimes against humanity by conveying the Brotherton Reservation without authority and without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.  SAC ¶¶ 118-129.

In Count 2, the plaintiffs allege that the State Defendants, in their official and individual capacities, violated 42 U.S.C. §§ 1983, 1985(3), and 1988.  Specifically, they assert that because the New Jersey Constitution was not ratified until August 13, 1844, all sales or relinquishment of their land, rights, privileges and immunities before that date are now moot, null, and void.  SAC ¶ 131.  Accordingly, the plaintiffs claim that the State Defendants violated their Fourteenth Amendment rights and their rights under the New Jersey Constitution by "colluding to circumvent the due process clause by passing an illegal state law that allowed the state counties to sell off land belonging to the [plaintiffs] without the review of, and approval of the United States Government."  *Id.* ¶ 137.

In Count 3, the plaintiffs allege that the State Defendants' actions with regard to the New

---

[7] After submitting his counseled brief, Holloway personally requested the Court to set aside his statement that he only asserts claims against the County Defendants under the NAGPRA, twice suggesting his brief was "in error." [D.E. 137, 143].  Magistrate Judge Patty Shwartz has already addressed and rejected these requests in an order granting the plaintiffs permission to substitute attorneys.  Specifically, Judge Shwartz concluded that the "the plaintiffs are bound by the positions taken in the briefs submitted in opposition to the motion to dismiss despite [the] change in counsel," and that "the change in counsel is not a basis to change legal positions taken in the this case and the positions are binding on the client."  [D.E. 152.]  The Court agrees.  Accordingly, it addresses the motions to dismiss mindful that the plaintiffs have expressly limited their claims against the County Defendants to those under the NAGPRA.

Jersey Commission on Native American Affairs[8] have violated Title VI of the Civil Rights Act of 1964 ("Title VI"), PUB. L. 88-352, § 601, 78 STAT. 252 (July 2, 1964), codified at 42 U.S.C. § 2000d, *et seq*.   Specifically, the plaintiffs assert that the State Defendants have unlawfully reserved appointment powers to the Commission for themselves, thereby "creating an arbitrary and capricious selection procedure that is selectively discriminatory."   SAC ¶ 144.   The plaintiffs allege that the State Defendants use federal funds "for minority programs[,] but have failed to ensure a non-discriminatory process by which all Indian Nations can be given an opportunity to compete equally for a position on said commission, and be represented by that body directly." *Id.* ¶ 143.

In Count 4, the plaintiffs allege that the State Defendants violated their rights under the Due Process Clause of the Fourteenth Amendment.   SAC ¶¶ 147-51.   Specifically, they assert that the defendants violated these provisions by "facilitating the sale of Indian lands to private interests without affording [them] the opportunity of Presidential or Congressional review." *Id.* ¶ 150

Counts 5, 7, and 8 each assert claims under the Nonintercourse Act based on the State Defendants' allegedly unauthorized 1802 land sale.   ¶¶ 152-57, 164-84.   The counts are separated to account for the loss of land (Count 5), the loss of water rights and revenues (Count 7) and the loss of their ostensibly unqualified hunting and fishing rights (Count 8).   Counts 7 and 8 also assert violations of the 1758 Treaty of Easton.

---

[8] The SAC names the New Jersey Commission on Indian Affairs as a defendant.  The Commission's official title, however, is the New Jersey Commission on American Indian Affairs.  N.J. Stat. Ann. § 52:16A-53.  The New Jersey State Department's website variously refers to the Commission as the New Jersey Commission on Native American Affairs, as well as by its correct title.  *See http://www.state.nj.us/state/divisions/community/indian/mission/* (last visited June 29, 2010).  There is no dispute, however, over the entity on which the plaintiffs seek representation. The Court refers herein to the "Commission" or by referencing its full official name.

In Count 6, the plaintiffs allege that the defendants, State and County, have violated the NAGPRA by "retaining, disturbing, possessing, and refusing to return valuable ancestral remains and cultural artifacts."  SAC ¶¶ 159-160.

In Count 9, the plaintiffs allege that the individual State Defendants violated Title VI by "selectively discriminate[ing]" against them in an "arbitrary and capricious selection process, their failure to adhere to their oath of office, and breach of their fiduciary responsibilities to the public at large."   SAC ¶ 187.   They seek an injunction ordering the removal of each representative of the New Jersey Commission of Indian Affairs, and establishing a "codified system that is level for all minorities and applied without discriminatory practices."  *Id.* ¶ 190.

In Count 11, the plaintiffs assert a direct constitutional claim arising from Article I, § 8, cl. 2 and Article II, § 2, cl. 2 of the federal Constitution.  They assert that as a result of the defendants' actions vis-à-vis the illegal 1802 land transaction, they have been "denied their constitutionally guaranteed right to deal with Congress in relationship to commerce."   SAC ¶ 198.

In Count 13, the plaintiffs allege that the State Defendants have violated the 1758 Treaty of Easton, which "guarantees [to them] hunting and fishing rights."  SAC ¶ 209.  The plaintiffs seek injunctive relief from the requirement that they purchase permits for their hunting and fishing activities.  *Id.* ¶ 210.  In Count 14, the plaintiffs seek a declaratory judgment pronouncing that the 1802 land transaction is in violation of the Nonintercourse Act, and that all resulting "land seizures . . . not sanctioned by the United States government are invalid and unenforceable."  SAC ¶ 219.  Finally, in Count 15, the plaintiffs seek restitution for all profits gained by defendants as a result of the wrongful seizure and use of their property.  SAC ¶¶ 224-25.

Aside from the declaratory and injunctive relief that the Court has already specified, the plaintiffs seek compensatory damages "in the amount of 999,999,999 1 oz. American Eagle Gold Coins, exclusive of punitive damages." They further seek, *inter alia*, "the return of all reservation, tribal, and private lands in whatever counties they may be found"; "[t]he return of all water rights[,] above and below ground"; "[a]ll hunting, fishing, and travel rights as previously enjoyed"; "[a]ll proceeds from the sale of tribal lands, waters, timber, mineral . . . from 1802 through [the] present"; "[a]ll burial, tribal, cultural[,] and other artifacts that are in existence" in the defendants' possession; "[o]fficial recognition as a Native American Indian tribe from both the State of New Jersey and the Federal Government"; and "[r]e-establishment of a New Jersey Indian Commission with representation by the plaintiffs." SAC Prayer for Relief ¶¶ (f)-(l), (p).

## III.  JURISDICTION & STANDARD OF REVIEW

The Court exercises subject-matter jurisdiction under 28 U.S.C. § 1331, as the plaintiffs' claims arise under the Constitution and laws of the United States. It also exercises jurisdiction over Count 6 pursuant to 25 U.S.C. § 3013. Given the uncertainty of the plaintiffs' tribal status, *see infra*, the Court does not exercise jurisdiction under 28 U.S.C. § 1362 (granting district courts "original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body *duly recognized by the Secretary of the Interior*, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.") (emphasis added). *See Price v. Hawaii*, 764 F.2d 623, 626 (9th Cir. 1985) ("Because neither the [tribal plaintiffs] nor their governing body have been 'duly recognized' by the Secretary, they do not qualify for § 1362 jurisdiction . . . .").

Rule 12(b)(6) provides a defense to pleaded causes of action where a complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). "To survive a

motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)); *accord Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556); *see also Mayer v. Belichick*, __ F.3d __, __, No. 09-2237, 2010 U.S. App. LEXIS 10212, at *16 (3d Cir. May 19, 2010) ("In order to withstand a motion to dismiss, a complaint's factual allegations must be enough to raise a right to relief above the speculative level.") (citations and internal quotation marks omitted). The Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff[s], and determine whether, under any reasonable reading of the complaint, [they] may be entitled to relief," *Phillips v. County of Allegheny*, 515 F.3d 224, 223 (3d Cir. 2008), but it is free to "disregard any legal conclusions." *Fowler*, 578 F.3d at 210-11. A complaint will not withstand a Rule 12(b)(6) challenge if it contains nothing more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Iqbal*, 129 S. Ct. at 1949; *see also Twombly*, 550 U.S. at 555 ("[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.") (citations and alterations omitted).

## IV.  DISCUSSION

Given the overlapping claims (some of which are conceptually redundant), the defendants have asserted several independent and alternative arguments in support of their respective motions. The Court addresses them in turn.

**A.**       **Preliminary Considerations**

1.   <u>Direct Constitutional Claims</u>

In Counts 1 and 4, the plaintiffs assert direct constitutional claims for violations of, and they seek redress under, the Fourteenth Amendment.  But "a plaintiff may not sue a state defendant directly under the Constitution where [42 U.S.C. §] 1983 provides a remedy." *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1382-83 (9th Cir. 1998).  *See also Azul-Pacifico, Inc. v. Los Angeles*, 973 F.2d 704, 705 (9th Cir. 1992) ("Plaintiff has no cause of action directly under the United States Constitution.  We have previously held that a litigant complaining of a violation of a constitutional right must utilize 42 U.S.C. § 1983."); *Thomas v. Shipka*, 818 F.2d 496, 499 (6th Cir. 1987) ("[I]n cases where a plaintiff states a constitutional claim under 42 U.S.C. § 1983, that statute is the exclusive remedy for the alleged constitutional violation[].")," *vacated on other grounds*, 488 U.S. 1036 (1989); *Hunt v. Robeson County Dep't of Social Servs.*, 816 F.2d 150, 152 n.2 (4th Cir. 1987) ("Because defendants here are all local officials, any cause of action against them for unconstitutional conduct under color of state law could only proceed under § 1983."); *Morris v. Metropolitan Area Transit Auth.,* 702 F.2d 1037, 1042 (D.C. Cir. 1983).

Instead, where "Congress has provided what it considers adequate remedial mechanisms for constitutional violations," *Schweiker v. Chilicky*, 487 U.S. 412, 423 (1988), direct constitutional claims against officials acting under color of state law are not cognizable.  And the plaintiffs here have an adequate statutory remedy for their claims against the State Defendants for their alleged due process violations, namely, 42 U.S.C. § 1983.  Indeed, the plaintiffs have

brought such claims against the State Defendants.  Counts 1 and 4 will therefore be dismissed.[9]

### 2.   Claims Asserted Under §§ 1983, 1985 and 1988

To the extent that the plaintiffs assert claims in Count 2 under 42 U.S.C. §§ 1983, 1985, and 1988 against the State itself, the New Jersey Commission on American Indian Affairs, and the individual defendants sued in their official capacities, those claims fail.   The State Defendants are correct that these defendants are not "persons" as § 1983 uses that term.[10]   *See Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) (holding that states and state officials acting in their official capacity are not "persons" under § 1983); *United States ex rel. Foreman v. State of N.J.*, 449 F.2d 1298 (3d Cir. 1971).

As is relevant here, § 1985(3) prohibits conspiracies between two or more persons to deprive a person or class of persons of equal protection of the laws.[11]   *See Estate of Oliva v. N.J., Dep't of Law & Pub. Safety, Div. of State Police*, 604 F.3d 788, __, No. 09-2082, 2010 U.S. App.

---

[9] The Court recognizes that the Third Circuit has not yet opined on this issue.  At the very least, however, since "§ 1983 affords a remedy for infringement of one's constitutional rights, identical claims raised under the Fourteenth Amendment are redundant, rendering the outcome of the § 1983 claims dispositive of the independent constitutional claims."  *Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009).  As the Court holds below that the plaintiffs' § 1983 claims bottomed on the Fourteenth Amendment fail in any event, so too do the direct constitutional claims.  In either case, these counts will not be discussed further.

[10]   Section 1983 states in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

[11]   Section 1985(3) states in relevant part:

> In any case of conspiracy set forth in this section, if one or more persons engaged therein do . . . any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, . . . the party so injured . . . may have an action for the recovery of damages occasioned by such injury or deprivation against any one or more of the conspirators.

LEXIS 9142, at *34-35 (3d Cir. May 4, 2010).  The Court agrees with the State Defendants that "persons" in § 1983 and "persons" in §1985 have the same meaning.  *See Rode v. Dellarciprete*, 617 F. Supp. 721, 723 n.2 (M.D. Pa. 1985), *vacated in part on other grounds*, 845 F.2d 1195 (3d Cir. 1988).  Thus, because "two or more *persons*" must conspire to be liable under § 1985, and because states and state officials sued in their official capacities are not "persons" and cannot be liable under § 1983, they cannot be liable under § 1985 either.  *See Santiago v. N.Y. State Dep't of Corr. Servs.*, 725 F. Supp. 780, 783 (S.D.N.Y. 1983).

Finally, § 1988 authorizes in civil rights cases resort to the remedies and procedures of the common law, where federal law is inadequate, and also permits a court to award attorney's fees to a prevailing party in certain cases.[12]  *See Post v. Payton*, 323 F. Supp. 799, 803 (E.D.N.Y. 1971).  It "does not create an independent cause of action."  *Id.*  Because "[§] 1988 is inapplicable where substantive law denies a plaintiff any right to relief," *Baker v. F & F*

---

[12]  Section 1988 reads in relevant part:

> (a) Applicability of statutory and common law.  The jurisdiction in civil and criminal matters conferred on the district and circuit courts . . . for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.
>
> (b) Attorney's fees. In any action or proceeding to enforce a provision of [42 USCS §§ 1981-1983, 1985, or 1986], [title 20 USCS §§ 1681 *et seq.*], the Religious Freedom Restoration Act of 1993, the Religious Land Use and Institutionalized Persons Act of 2000, title VI of the Civil Rights Act of 1964, or section 40302 of the Violence Against Women Act of 1994, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . .

*Investment*, 420 F.2d 1191, 1196 (7th Cir. 1970) – as it does here, *see infra* – the plaintiffs' invocation of it provides them no assistance.

The Court will therefore dismiss Count 2 insofar as it is asserted against the State Defendants – the entities and the individuals sued in their official capacities. To the extent that Count 2 remains viable, the Court addresses it below.

**B.    Nonintercourse Act Claims**

       1.    <u>Eleventh Amendment Immunity</u>

The plaintiffs base Counts 5, 7, 8, 11, 14, and 15 of the SAC on the 1802 land transaction that the plaintiffs claim violated the Nonintercourse Act.[13] (Count 2 is also based to some extent on the challenged sale of the Brotherton Reservation. The Court's discussion in this section applies equally to that count as well.) The State Defendants argue that these claims are barred by the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const., Amend. XI. The Eleventh Amendment renders unconsenting States, state agencies, and state officers sued in their official capacities immune from suits brought in federal courts by private parties, including Indian tribes and their members. *See Idaho v. Coeur d' Alene Tribe*, 521 U.S. 261, 268-269 (1997) ("Under well established principles, the Coeur d'Alene Tribe, and, *a fortiori*, its members, are subject to the Eleventh Amendment."); *Blatchford v. Native Village of Noatak and Circle Village*, 501 U.S. 775 (1991); *Edelman v. Jordan*, 415 U.S. 651, 662-63

---

[13] Counts 7 and 8 also assert violations of the 1758 Treaty of Easton. That portion of Counts 7 and 8 will be addressed below.

(1974); *Haybarger v. Lawrence County Adult Prob. & Parole*, 551 F.3d 193, 197 (3d Cir. 2008); *Lombardo v. Pa. Dep't of Pub. Welfare*, 540 F.3d 190, 194-95 (3d Cir. 2008).

The shield of the Eleventh Amendment extends to "subunits of the State." *Haybarger*, 551 F.3d at 198 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984)); *accord Benn v. First Judicial District of Pennsylvania*, 426 F.3d 233 (3d Cir. 2005). Thus, the New Jersey Commission on American Indian Affairs is clearly protected by sovereign immunity as well. *See Capogrosso v. Supreme Court of N.J.*, 588 F.3d 180, 185 (3d Cir. 2009) ("The Eleventh Amendment to the United States Constitution protects an unconsenting state or *state agency* from a suit brought in federal court, regardless of the relief sought.") (emphasis added); *C.H. ex rel. Z.H. v. Oliva*, 226 F.3d 198, 201 (3d Cir. 2000) (en banc); *cf. Fitchik v. N.J. Transit Rail Operations*, 873 F.2d 655, 658 (3d Cir. 1989) (en banc). But the state sovereign-immunity shield "does not extend to counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (citing *Moor v. County of Alameda*, 411 U.S. 693, 717-721 (1973); *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890)).[14] Accordingly, the discussion below does not apply to the County Defendants. (In any event, however, the plaintiffs have expressly stated that they do not assert these claims against the County Defendants. *See supra* note 7.) Nor does the Eleventh Amendment immunize state officers sued in their individual capacities. *See Hafer v. Melo*, 502 U.S. 21, 30-31 (1991). However, the Counts listed above, save Count 2, are asserted against the individual defendants in their official

---

[14] *See also Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979) (stating that the Court "has consistently refused to construe the [Eleventh] Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power'"); *Chisolm v. McManimon*, 275 F.3d 315, 322 (3d Cir. 2001) ("While Eleventh Amendment immunity may be available for states, its protections do not extend to counties."); *Tuveson v. Florida Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir. 1984) ("Eleventh Amendment immunity does not extend to independent political entities, such as counties."); *Hall v. Medical College of Ohio*, 742 F.2d 299, 301 (6th Cir. 1984) ("Municipalities, counties and other political subdivisions (e.g., public school districts) do not partake of the state's Eleventh Amendment immunity.").

capacities only.   (Again, the Court addresses below Count 2 to the extent asserted against individual officers in their personal capacities.)

Because Counts 5, 7, 8, 11, 14, and 15 are asserted against the State of New Jersey, the Commission, and the individual defendants in their official capacities, they are barred by the Eleventh Amendment if one of three exceptions does not apply:  (1) congressional abrogation; (2) state waiver; or (3) suits against individual state officers for prospective injunctive relief to end an ongoing violation of federal law.   *MCI Telecommunication Corp. v. Bell Atlantic-Pennsylvania*, 271 F.3d 491, 503 (3d Cir. 2001) (hereinafter "*MCI*").

### a.  Congressional Abrogation

"Congress may, in some limited circumstances, abrogate sovereign immunity and authorize suits against states.  If a statute has been passed pursuant to congressional power under § 5 of the Fourteenth Amendment to enforce the provisions of that amendment, Congress can abrogate a state's sovereign immunity."  *MCI*, 271 F.3d at 503 (citations omitted).  But Congress may not "abrogate state sovereign immunity when a statute is passed pursuant to its Article I powers, such as the Commerce Clause[.]"  *Id.*; *see also Board of Tr. of Univ. of Alabama v. Garrett*, 531 U.S. 356, 121 S. Ct. 955, 962, 148 L. Ed. 2d 866 (2001) ("Congress may not, of course, base its abrogation of the States' Eleventh Amendment immunity upon the powers enumerated in Article I."); *Seminole Tribe v. Florida*, 517 U.S. 44 (1996).  Congress passed the Nonintercourse Act using its Article I powers, i.e., the Indian Commerce Clause.  It therefore "did not, and could not, abrogate Eleventh Amendment immunity . . . ."  *MCI*, 271 F.3d at 503.  Accordingly, "[a]brogation is not implicated here."  *Id.*; *see also Ysleta Del Sur Pueblo v. Laney*, 199 F.3d 281, 288 (5th Cir. 2000) (finding it "nonsensical" to believe that Congress abrogated Eleventh Amendment immunity under the Fourteenth Amendment, as the NIA was passed

16

*before* the Fourteenth Amendment); *cf. Schlossberg v. Maryland*, 119 F.3d 1140, 1145-47 (4th Cir. 1997) ("We will not presume that Congress intended to enact a law under a general Fourteenth Amendment power to remedy an unspecified violation of rights when a specific, substantive Article I power clearly enabled the law.").[15]

### b.  Waiver

"[A] state may waive sovereign immunity by consenting to suit."  *MCI*, 271 F.3d 503 (citations omitted).  "The waiver by the state must be voluntary and our test for determining voluntariness is a stringent one."  *Id.*  Specifically, "[t]he state either must voluntarily invoke our jurisdiction by bringing suit (not the case here) or must make a clear declaration that it intends to submit itself to our jurisdiction."  *Id.* at 504 (citations and internal quotation marks omitted).

The plaintiffs argue that the illegality of the State Defendants' actions constitutes a voluntary waiver of their Eleventh Amendment immunity.  That would put the cart before the horse.  The entire point of sovereign *immunity* is to *immunize* states from suit and liability, even if the challenged actions are unlawful.  "The Eleventh Amendment bar does not vary with the merits of the claims pressed against the State."  *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 252 (1985).  The State Defendants have not waived their Eleventh Amendment immunity.

### c.  *Ex Parte Young*

"The third exception to the Eleventh Amendment is the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), under which individual state officers can be sued in their individual capacities

---

[15] Even assuming, *arguendo*, that Congress could validly abrogate sovereign immunity using the powers granted to it at the time it passed the Nonintercourse Act, the Court agrees with the Court of Appeals for the Fifth Circuit that "the statute, on its face, does not provide an unmistakably clear intent to abrogate state sovereign immunity." *Ysleta*, 199 F.3d at 288.  Because "[a] valid abrogation of Eleventh Amendment immunity requires Congress to 'unequivocally express[] its intent to abrogate the immunity,'" *Wheeling & Lake Erie Ry. v. Pub. Util. Comm'n of Pa.*, 141 F.3d 88, 92 (3d Cir. 1998) (quoting *Seminole Tribe*, 517 U.S. at 55), and because such a statement is absent from the Nonintercourse Act, the State Defendants' sovereign immunity remains intact for this additional reason.

for prospective injunctive and declaratory relief to end continuing or ongoing violations of federal law." *MCI*, 271 F.3d at 506.  "However, *Young* does not apply if, although the action is nominally against individual officers, the state is the real, substantial party in interest and the suit in fact is against the state." *Id.* (citing *Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 103 (1984)).  Moreover, the Supreme Court in *Coeur d' Alene*, *supra*, extended this real-party-in-interest doctrine in unique situations that would inflict significant harm on the fundamental sovereignty of the state itself.  As the Third Circuit has explained it:

> *Coeur d'Alene* did carve out one narrow exception to *Young*:  An action cannot be maintained under *Young* in those unique and special circumstances in which the suit against the state officer affects a unique or essential attribute of state sovereignty, such that the action must be understood as one against the state.   One example of such special, essential, or fundamental sovereignty is a *state's title, control, possession, and ownership of water and land, which is equivalent to its control over funds of the state treasury.*  *See Coeur d' Alene*, 521 U.S. at 287; *id.* at 296-97 (O'Connor, J., concurring in part and concurring in the judgment).  This exception is best understood as an application of the general rule that *Young* does not permit actions that, although nominally against state officials, in reality are against the state itself.  *See Pennhurst*, 465 U.S. at 102.

*MCI*, 271 F.3d at 508 (emphasis added).

The Court agrees with the State Defendants that the relief the plaintiffs seek requires application of the *Coeur d' Alene* "exception to the exception."  Entering an injunction requiring the State Defendants to return their sovereign land would implicate precisely the type of "core or fundamental matter of state sovereignty comparable to the ability of a state to maintain ownership of and title to its . . . lands." *MCI*, 271 F.3d at 515.  The injunctive relief the plaintiffs

seek squarely triggers "the state interest . . . derive[d] from its general sovereign powers." *Id.*
With respect to the counts now under discussion, therefore, *Ex Parte Young* does not apply.[16]

*     *     *

None of the exceptions to the State Defendants' Eleventh Amendment immunity applies.
The claims against the State Defendants asserted in Counts 5, 7, 8, 11, 14, and 15 (except to the
extent asserted against individual defendants in their individual capacities) are accordingly
barred by the Eleventh Amendment and will be dismissed.

2.   Deference to the Primary Jurisdiction of the Bureau of Indian Affairs

The State Defendants alternatively argue that the Nonintercourse Act claims should be
dismissed because existing factual issues require extensive involvement of an administrative
agency better equipped to answer such questions.  Specifically, a plaintiff asserting an NIA claim
must prove, among other things, that it is a *bona fide* Indian tribe.  Accordingly, because the
Sand Hill Band in this action is not a federally recognized Indian tribe, and because such
recognition would require complex determinations by the federal Bureau of Indian Affairs
("BIA"), the State Defendants argue that this Court should defer to the primary jurisdiction of the
BIA before adjudicating the Nonintercourse Act claims.  The Court agrees.  Though it has
accepted the State Defendants' Eleventh Amendment arguments above, weighty considerations
of institutional competence counsel this Court to defer to the BIA's historical, genealogical, and
anthropological expertise before any adjudication on the merits would otherwise be appropriate.
*See United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 551 (10th Cir. 2001)

---

[16] In their opposition brief, the plaintiffs challenge the defendants' actions vis-à-vis representation on the New Jersey
Commission on American Indian Affairs.  Pl. Opp. to State Br. at 9-12.  Moreover, they inject additional factual
allegations that do not appear in the SAC, and the Court has not considered them.  In any event, these allegations do
not concern the 1802 land transaction that underpins the claims now under consideration.  The Court here considers
the application for prospective injunctive relief only as it relates to the challenged land transaction.  To the extent the
plaintiffs ask the Court to enjoin the State Defendants from unlawfully depriving them of representation on the
Commission, the Court addresses that point below.

("Determining whether a group of Indians exists as a tribe is a matter requiring . . . specialized agency expertise . . . ."); *W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1057 (10th Cir. 1993) ("The judiciary has historically deferred to executive and legislative determinations of tribal recognition." (citing *United States v. Rickert*, 188 U.S. 432, 445 (1903); *United States v. Holliday*, 70 U.S. 407, 419 (1865))).   The NIA claims will be dismissed for this independent reason.

Again, the plaintiffs allege that their property rights were protected by – and later violated under – the Nonintercourse Act, 25 U.S.C. § 177, which provides that no person or entity may purchase or sell Indian lands without the federal government's approval.  *See supra* note 5.  To establish a *prima facie* NIA violation, a plaintiff must establish four elements:  (1) that it is an Indian tribe; (2) that the land in question is tribal land; (3) that the United States has never consented to or approved the alienation of this tribal land; and (4) that the trust relationship between the United States and the tribe has not been terminated or abandoned.[17]  *Delaware Nation v. Pennsylvania*, 446 F.3d 410, 418 (3d Cir. 2006).[18]

Focus on the first.  "To prove tribal status under the Nonintercourse Act, an Indian group must show that it is a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory."  *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 59 (2d Cir. 1994) (citations omitted).  Recall, however, that in this case the plaintiffs' tribal authenticity is hotly

---

[17] It bears noting that Holloway cannot recover personally for any alleged NIA violation.  "The Nonintercourse Act protects only Indian tribes or nations, and not individual Indians."  *Unalachtigo Band*, 867 A.2d at 1226 (citing *James v. Watt*, 716 F.2d 71, 72 (1st Cir. 1983)).  The NIA claims are therefore dismissed to that extent.

[18] *See also Seneca Nation of Indians v. New York*, 382 F.3d 245, 258 (2d Cir. 2004); *Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 56 (2d Cir. 1994); *Catawba Indian Tribe v. South Carolina*, 718 F.2d 1291, 1295 (4th Cir. 1983), *aff'd*, 740 F.2d 305 (4th Cir. 1984) (en banc), *rev'd on other grounds*, 476 U.S. 498 (1986); *Epps v. Andrus*, 611 F.2d 915, 917 (1st Cir. 1979) (per curiam); *cf. Montoya v. United States*, 180 U.S. 261, 266 (1901).

disputed, as another tribal group claims that its members (and not the plaintiffs) comprise the real Sand Hill Band.  *See supra* note 4.  Given this factual dispute and the fact that the plaintiffs have either (1) not yet begun the federal recognition process (which would involve proving their tribal authenticity); or (2) have only recently begun taking those steps, the BIA is the proper forum to resolve these issues before any legitimate analysis in this Court could be undertaken.

In 1832, Congress established within the Executive Branch the office of Commissioner of Indian Affairs, and delegated authority to that officer to oversee "all matters arising out of Indian relations."  4 STAT. 564, § 1 (July 9, 1832), codified at 25 U.S.C. §§ 1, 2.  Two years later, Congress granted the President authority to "prescribe such rules and regulations as he may think fit, for carrying into effect the various provisions of [any act] relating to Indian affairs[.]"  4 STAT. 738, § 17 (June 30, 1834), codified as amended at 25 U.S.C. § 9.  In the same act, Congress also established the Department of Indian Affairs, predecessor to the BIA.  *See Golden Hill Paugussett Tribe*, 39 F.3d at 57; 4 STAT. 735-38 (June 30, 1984).

Almost 150 years later, the Department of the Interior exercised its regulatory authority by promulgating a detailed administrative program known as the "federal acknowledgement process," under which the BIA "recognize[s] American Indian tribes on a case-by-case basis." *Golden Hill Paugussett Tribe*, 39 F.3d at 57; *see also Miami Nation of Indians v. U.S. Dep't of the Interior*, 255 F.3d 342, 345 (7th Cir. 2001).  Federal recognition bestows upon Indian tribes certain rights and privileges.  Chief among them are quasi-sovereignty and the ability to acquire land (to be held in trust by the federal government).  *See* 25 C.F.R. § 151.3-4.  When a tribal group seeks formal recognition (by filing a letter of intent with the BIA, and then later a full-fledged petition for recognition), the BIA conducts a complex historical, anthropological, and genealogical study to determine whether the group is in fact a *bona fide* "Indian tribe"

21

warranting governmental recognition.  *See Golden Hill Paugussett Tribe*, 39 F.3d at 57; 25 C.F.R. § 83.1, *et seq.*

A tribal group seeking federal recognition must satisfy seven mandatory criteria:  (a) the group has been identified as an American Indian entity on a substantially continuous basis since 1900; (b) a "predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present"; (c) the petitioning group "has maintained political influence or authority over its members as an autonomous entity from historical times until the present"; (d) a copy of the group's present governing document must be submitted, including its membership criteria; (e) the petitioning group's "membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity"; (f) the group's membership is composed principally of persons who are not members of any already-acknowledged North American Indian tribe; and (g) neither the petitioning group nor its members are the subject of congressional legislation that has expressly precluded their relationship with the federal government.  25 C.F.R. § 83.7; *see also Miami Nation of Indians*, 255 F.3d at 345-46.  By its nature, this multifaceted inquiry is fact-intensive and complex.

The plaintiffs fail to proffer in the SAC non-conclusory facts explaining how they themselves are the authentic lineal descendants entitled to assert NIA claims pertaining to the sale of the Brotherton Reservation.  Bald assertions that an entity is a "tribe" – especially where, as here, competing groups assert mutually exclusive claims of tribal membership – are not sufficient.  *See Shawnee Indians*, 253 F.3d at 548 (rejecting plaintiff's claim on motion to dismiss that BIA acted outside its authority when it denied tribal recognition; stating that the plaintiff's "argument assumes the very factual issue at the heart of this litigation," and that

plaintiff "can only prevail on its contention if we accept its bare assertion that it is the present-day embodiment of the Shawnee Tribe"); *cf. Twombly*, 550 U.S. at 555.  In short, the SAC is devoid of any specific allegations that would permit the Court to draw a plausible inference that the plaintiffs are who they say they are.  Nor does the complaint allege that the plaintiffs have ever petitioned the BIA for federal acknowledgement.  (The plaintiffs do claim in their brief – but without providing any factual or contextual support – that they initiated the BIA process at some point in 2007.  Pl. Opp. to State Br. at 26.)  Given the factual dispute over the plaintiffs' ancestral lineage, the BIA is better equipped than is this Court to adjudicate these intricate matters.  For the reasons that follow, dismissal of the NIA claims is appropriate under the doctrine of primary jurisdiction.

The doctrine of primary jurisdiction "'applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'"  *MCI*, 71 F.3d at 1103 (quoting *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1230 n.5 (3d Cir. 1994)).   In other words, the doctrine "applies where the administrative agency cannot provide a means of complete redress to the complaining party and yet the dispute involves issues that are clearly better resolved in the first instance by the administrative agency charged with regulating the subject matter of the dispute."  *Id.* at 1105 (citation omitted).[19]  "There is no fixed formula for determining whether the doctrine of primary

---

[19] *See also CSX Transp. Co. v. Novolog Bucks County*, 502 F.3d 247, 253 (3d Cir. 2007) ("Primary jurisdiction is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.") (citations and internal quotation marks omitted), *cert. denied*, 128 S. Ct. 1240 (2008); *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 736 (3d Cir. 1983) (stating that the doctrine applies when decisionmaking "is divided between courts and administrative agencies [and] calls for judicial abstention in cases where protection of the integrity of a regulatory scheme dictates primary resort to the agency which administers the scheme"); *Golden Hill Paugussett Tribe*, 39 F.3d at 58-59 ("Primary jurisdiction applies where a claim is originally cognizable in the courts, but enforcement of the claim requires, or is materially

jurisdiction applies and matters should be evaluated on a case-by-case basis." *Global Naps, Inc. v. Bell Atlantic-New Jersey, Inc.*, 287 F. Supp. 2d 532, 549 (D.N.J. 2003) (Greenaway, J.).[20]

The Court recognizes "that tribal status for purposes of obtaining federal benefits is not necessarily the same as tribal status under the Nonintercourse Act." *Golden Hill Paugussett Tribe*, 39 F.3d at 57; *see also Joint Tribal Council of Passamaquody Tribe v. Morton*, 528 F.2d 370, 377 (1st Cir. 1975) ("There is nothing in the [NIA] to suggest that 'tribe' is to be read to exclude a *bona fide* tribe not otherwise federally recognized."). And it is true, as the plaintiffs advise, that the BIA lacks the ultimate jurisdiction to resolve NIA claims. *See Golden Hill Paugussett Tribe*, 39 F.3d at 57. Yet the issues of Indian status for NIA purposes and Indian status under the federal recognition program "overlap to a considerable extent." *Id.* Especially so in this case. The antecedent issue of the plaintiffs' tribal status is tightly intertwined with their claim that the defendants have deprived *them* (and not other alleged Sand Hill Indians) of personal property rights. In other words, while a federal court must adjudicate the NIA claim, here this Court cannot do so due to the live dispute over the legitimacy of the plaintiffs' ancestry. *See Passamaquody Tribe*, 528 F.2d at 377 ("This is not to say that *if there were doubt about the tribal status of the Tribe*, the judgments of officials in the federal executive branch might not be of great significance.") (emphasis added). Because an altogether different group claims that it is the rightful Sand Hill Band, whether the plaintiffs are an "Indian tribe" for NIA purposes is an issue parallel with, if not identical to, the federal government's failure (thus far) to recognize the plaintiffs as an 'Indian tribe" under the administrative scheme.

---

aided by, the resolution of threshold issues, usually of a factual nature, which are placed within the special competence of the administrative body.").

[20] The Court has taken into account the four factors listed by the Court in *Global Naps*, *see* 287 F. Supp. 2d at 549, and its analysis reflects those queries. To the extent that the plaintiffs believe these factors comprise a four-element "test," *see* Pl. Opp. to State Br. at 26, they are not correct, as the court in *Global Naps* explicitly emphasized the flexible nature of the inquiry.

The Second Circuit's invocation of the primary jurisdiction doctrine in *Golden Hill Paugussett Tribe* is on point and instructive. In that case, a tribal group asserted a land claim pursuant to the Nonintercourse Act, claiming that an 1802 Connecticut land sale violated the NIA. 39 F.3d at 54. The defendants argued that the tribe could not assert NIA claims because it had not been recognized by the Department of the Interior (although a petition with the BIA had been filed), and the district court agreed, dismissing the complaint for lack of subject-matter jurisdiction. *Id.* at 55-56. Though the Second Circuit rejected the district court's dismissal on standing and subject-matter jurisdiction grounds, it found the doctrine of primary jurisdiction on stronger footing. The court recognized the discrete difference between the tribal status necessary to press a claim under the Nonintercourse Act and the tribal status necessary for BIA recognition. Nonetheless, the Second Circuit held that the issues were close enough to warrant judicial deference to the primary expertise of the BIA. This Court quotes at length Judge Cardamone's incisive analysis:

> The primary jurisdiction doctrine serves two interests: consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency; and the resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims.
>
> Federal courts have held that to prove tribal status under the Nonintercourse Act, an Indian group must show that it is "a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory." *See*, *e.g.*, *United States v. Candelaria*, 271 U.S. 432, 442 (1926) (quoting *Montoya v. United States*, 180 U.S. 261, 266 (1901))[.] The formulation of this standard and its use by the federal courts occurred after Congress delegated to the executive branch the power to prescribe regulations for carrying into effect statutes relating to Indian affairs . . . and without regard to whether or not the particular group of Indians at issue had been recognized by the Department of the Interior. . . .

The *Montoya/Candelaria* definition [for NIA purposes] and the BIA criteria *both have anthropological, political, geographical and cultural bases and require, at a minimum, a community with a political structure. The two standards overlap, though their application might not always yield identical results.* A federal agency and a district court are not like two trains, wholly unrelated to one another, racing down parallel tracks towards the same end. *Where a statute confers jurisdiction over a general subject matter to an agency and that matter is a significant component of a dispute properly before the court, it is desirable that the agency and the court go down the same track – although at different times – to attain the statute's ends by their coordinated action.*

Whether there should be judicial forbearance hinges therefore on the authority Congress delegated to the agency in the legislative scheme. The BIA has the authority to prescribe regulations for carrying into effect any act relating to Indian affairs. Before the promulgation of the acknowledgment regulations there did not exist a uniform, systematic procedure to determine tribal status within the Department of the Interior. Therefore, deferral of the issue of tribal status was not required nor would it aid a court in its determination. The Department of the Interior's creation of a structured administrative process to acknowledge "nonrecognized" Indian tribes using uniform criteria, and its experience and expertise in applying these standards, has now made deference to the primary jurisdiction of the agency appropriate. In fact, the creation in 1978 of the acknowledgment process currently set forth in 25 C.F.R. Part 83 – a comprehensive set of regulations, the BIA's experience and expertise in implementing these regulations, and the flexibility of the procedures weigh heavily in favor of a court's giving deference to the BIA. . . .

The general notion of deference was the philosophical basis for Justice Frankfurter's opinion in *Far East Conference v. United States*, 342 U.S. 570 (1952). There, in writing for the Court, he explained that *issues of fact not within the ordinary ken of judges and which required administrative expertise should be resolved preliminarily by the agency, which Congress has vested with authority over the subject matter, even though the ascertained facts later serve "as a premise for legal consequences to be judicially defined." Id.* at 574. *A court should delay forging ahead when there is a likelihood that agency action may render a complex fact pattern simple or a lengthy judicial proceeding short.*

Thus, the judicial hand should be stayed pending reference of plaintiff's claims to the agency for its views. A federal court, of course, retains final authority to rule on a federal statute, but should avail itself of the agency's aid in gathering facts and marshalling them into a meaningful pattern. As a consequence, under the present circumstances, the BIA is better qualified by virtue of its knowledge and experience to determine at the outset whether Golden Hill meets the criteria for tribal status. This is a question at the heart of the task assigned by Congress to the BIA and should be answered in the first instance by that agency. The BIA's resolution of these factual issues regarding tribal status will be of considerable assistance to the district court in ultimately deciding Golden Hill's Nonintercourse Act claims.

*Id.* at 59-60 (emphasis added, some internal citations omitted).[21]

And so it is here. This Court is ill-equipped to assess the anthropological, political, geographical, genealogical, and cultural minutiae necessary to determine whether the plaintiff Sand Hill Band qualifies as a tribe under the NIA, whether it deserves federal acknowledgment, and whether the plaintiffs are in fact the rightful successors of the Brotherton Indians. This is especially true where, as here, the veracity of plaintiffs' claim of tribal ancestry has been called into question by the State Defendants and third parties. *See Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. New Jersey*, 867 A.2d 1222, 1231 (N.J. Super. Ct. App. Div. 2005) (dismissing for lack of subject-matter jurisdiction NIA claim challenging the same land transaction challenged here, and strongly suggesting that the plaintiffs "first obtain a determination from the BIA that the Unalachtigo Band constitutes an Indian tribe directly descendant from the tribe of Indians who lived on the Brotherton Reservation"). And, as noted, still other groups have laid claim to the land now at issue. *See generally id.*; *Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. Corzine*, No. 05-5710, 2008 U.S. Dist. LEXIS 108393

---

[21] *Cf. also Shawnee Indians*, 253 F.3d at 550-51 (affirming dismissal of suit seeking federal recognition, and requiring exhaustion of administrative efforts in the BIA before federal adjudication becomes appropriate); *James v. U.S. Dep't of Health & Human Services*, 824 F.2d 1132, 1138 (D.C. Cir. 1987) (same).

(D.N.J. May 20, 2008); *supra* note 4.  The competing land claims and the competing claims to rightful membership in the Sand Hill Band relegate this Court's institutional expertise far behind that of the executive agency established precisely to make these types of determinations.

And therefore, even had the Court rejected the State Defendants' claim to immunity secured by the Eleventh Amendment (which it has not), it would dismiss the SAC's claims under the Nonintercourse Act based upon these disputed ancestral issues, whose resolution would first be required before a proper analysis of the NIA claims could be undertaken.  Because two coordinate branches of government have promulgated a well-developed scheme for answering these difficult questions, it behooves this Court not to volunteer answers in the first instance.[22]

## C.    Title VI

In Counts 3 and 9, the plaintiffs allege that the individual State Defendants, in their personal capacities, have violated their civil rights secured by Title VI of the Civil Rights Act of 1964.  The plaintiffs claim in Count 3 that the State Defendants "have failed to ensure a non-discriminatory process by which all Indian Nations can be given an opportunity to compete for a position on [the New Jersey Commission on American Indian Affairs], and be represented by that body directly."   SAC ¶ 143.  They claim in Count 9 that the State Defendants have "selectively discriminated against [them] by their arbitrary and capricious selection process" to the Commission.  SAC ¶ 187.  The plaintiffs seek, in addition to damages, injunctive relief

---

[22] Normally a court's invocation of the doctrine of primary jurisdiction compels referral of the matter to the executive agency.  *See CSX*, 502 F.3d at 253; *Golden Hill Paugussett Tribe*, 39 F.3d at 59-60.  And had the Court rejected the sovereign immunity arguments discussed above, it would indeed have referred the matter to the BIA for a threshold resolution of these issues.  *See Global Naps*, 287 F. Supp. 2d at 549-50 (after holding that it had no subject-matter jurisdiction over two particular claims, stating that even if it did it would defer under the primary jurisdiction doctrine and refer the matter to the appropriate agency).  Given the Court's Eleventh Amendment holding, however, it makes no referral to the BIA in this case.  The Court's primary jurisdiction discussion here serves only as an additional, independent reason why the NIA claims are not properly before this Court.

requiring removal of all representatives currently sitting on the Commission and immediate appointment in their favor. *Id.* ¶ 190.[23]

Relevant here, Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.  The statute "provides for federal funding to be terminated if an entity receiving assistance fails to comply with its requirements." *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir. 2007) (en banc); 42 U.S.C. § 2000d-1.  Additionally, though it contains no express private right of action, the Supreme Court has found in the statute an implied private right of action.  *See id.* (citing *Barnes v. Gorman*, 536 U.S. 181, 185 (2002)).  To establish a *prima facie* Title VI violation, the plaintiff must plead sufficiently (1) that there is racial or national origin discrimination and (2) that the entity engaging in discrimination is receiving federal financial assistance.  *Baker v. Bd. of Regents of State of Kan.*, 991 F.2d 628, 631 (10th Cir. 1993)

The State Defendants argue that the plaintiffs improperly sued them in their individual capacities, because Title VI claims may only be brought against organizations.  While the Third Circuit has not squarely addressed the issue in a precedential decision,[24] the Sixth and Eleventh

---

[23] The SAC cites *Ex Parte Young* in seeking injunctive relief.  SAC ¶¶ 186, 189.  As the State Defendants correctly point out, however, resort to *Young* is unnecessary here, for Congress has abrogated Eleventh Amendment immunity in Title VI cases.  *See Three Rivers Ctr. for Indep. Living, Inc. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 426 n. 14 (3d Cir. 2004) (quoting *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 72 (1992)); 42 U.S.C. § 2000d-7.

[24] *But see Shannon v. Lardizzone*, 334 F. App'x 506, 508 (3d Cir. (2009) (per curiam) (not precedential) ("Courts have held that, because Title VI forbids discrimination only by recipients of federal funding, individuals cannot be held liable under Title VI.  We agree with this reasoning.") (internal citations omitted); *cf. Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002) (noting that there is no individual liability under Title IX of the Education Amendments Act of 1972, which is substantially similar to Title VI).

Circuits have held that individual defendants are not proper defendants under Title VI, because they are not "program[s] or activit[ies]" receiving federal financial assistance. *See Shotz v. City of Plantation*, 344 F.3d 1161, 1169 (11th Cir. 2003); *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir. 1996), *superseded by statute on other grounds*, *see Hernandez v. Attisha*, No. 09-2257, 2010 U.S. Dist. LEXIS 20235, at *8 (S.D. Cal. Mar. 5, 2010).[25]   The Court agrees that individuals are not the proper defendants in a Title VI case.  To the extent Counts 3 and 9 seek relief against individual state officials for violations of Title VI, therefore, the claims will be dismissed because those defendants do not fall within the statute's scope.[26]

To the extent Counts 3 and 9 can be liberally construed as claims against the proper defendants – the State of New Jersey or the Commission itself (and to the extent the SAC properly seeks injunctive relief against the individual state officers) – they fail as well.  The plaintiffs have not "plead[ed] factual content that allows the court to draw the reasonable inference that the [State Defendants are] liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  Instead, Counts 3 and 9 (*see* SAC ¶¶ 141-46, 185-90), along with the SAC's background

---

[25] *Accord Taylor v. Altoona Area Sch. Dist.*, 513 F. Supp. 2d 540, 558 (W.D. Pa. 2007); *Folkes v. N.Y. Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 214 F. Supp. 2d 273, 292 (E.D.N.Y. 2002); *Steel v. Alma Pub. Sch. Dist.*, 162 F. Supp. 2d 1083, 1085 (W.D. Ark. 2001); *Powers v. CSX Transp., Inc.*, 105 F. Supp. 2d 1295, 1311-12 (S.D. Ala. 2000); *Wright v. Butts*, 953 F. Supp. 1343, 1350 (M.D. Ala. 1996); *Jackson v. Katy Indep. Sch. Dist.*, 951 F. Supp. 1293, 1298 (S.D. Tex. 1996).

[26] The State Defendants also argue that the Title VI claims fail because the New Jersey Commission on American Indian Affairs does not receive or distribute federal funding, a necessary prerequisite for a Title VI claim.  The SAC specifically alleges that the Commission receives federal funding, *see, e.g.*, SAC ¶ 145, and the plaintiffs have submitted documentation from the State demonstrating that the Commission obtains *revenues* in the amount of $150,000.  *See* D.E. # 128-8.  But the documentation plainly does not establish that the Commission receives funds from the federal government.  Other publicly available information suggests quite the opposite.  *See* Table, Office of Management & Budget, New Jersey Department of the Treasury, *Federal Funds Appropriations*, FY 2008-2009, at D-12-13 (listing no federal funds appropriations to the Commission of American Indian Affairs), *available at http://www.state.nj.us/treasury/omb/publications/09budget/index.shtml* (last visited June 29, 2010).  Furthermore, the State Defendants have offered to certify that the Commission receives no federal funding.  Def. Rep. Br. at 20.  Given the Court's resolution herein, and the present procedural posture, such a certification is unnecessary.  The Court will not address the funding issue in greater detail at this time.  The Court mentions it, however, for completeness.

allegations (*see* SAC ¶¶ 10-11, 15, 112-17), do little more than assert in conclusory and threadbare fashion that the defendants have, for instance, "colluded with the [Commission] and the Indian entities represented therein, to keep the plaintiff[s] from being given representation on that body[.]" *Id.* ¶ 10.

The plaintiffs suggest that the Commission selection process is discriminatory and arbitrary because the defendants "have reserved appointment power to themselves," SAC ¶ 144, and because the defendants have failed to "insure [sic] institution of a codified standard by which all Indian Nations can be selected for representation." *Id.* But it is the very statute creating the Commission that accords such appointment powers to the Governor. *See* N.J. Stat. Ann. § 52:16A-53. Specifically, the statute prescribes that the Commission be comprised of nine members:  the Secretary of State (*ex officio*) and eight tribal members. *Id.* Six of the members must be appointed from the following three tribes (two members per tribe):  the Nanticoke Lenni Lenape Indians, the Ramapough Mountain Indians, and the Powhatan Renape Nation. *Id.* These members are to be recommended by their respective tribes, and are "appointed by the Governor . . . with the advice and consent of the Senate." *Id.* The other two members must be members of the "Intertribal People," that is, "American Indians who reside in New Jersey and are not members of the Nanticoke Lenni Lenape Indians, the Ramapough Mountain Indians, or the Powhatan Renape Nation, but are enrolled members of another tribe recognized by another state or the federal government." *Id.*

The complaint fails to allege why or how the State Defendants have violated the federal statutory rights of the plaintiffs by appointing, pursuant to the Commission selection scheme – persons other than the plaintiffs. If the plaintiffs believe that the Intertribal allotment and the favored appointments of the three tribes specified by § 52:16A-53 is ill-advised or bad policy,

their remedy is with the Legislature.  But such a belief does not in itself establish discriminatory conduct actionable under Title VI.[27]

Vague allegations that the individual defendants "arbitrarily select members to the . . . Commission . . . with no regard for fairness," SAC ¶ 116, that the selection process is "arbitrary and capricious," *id.*, and that the defendants have "selectively discriminated against the [p]laintiff[s], *id.* ¶ 111, "will not do."  *Twombly*, 550 U.S. at 555.  This Court is not obliged to accept as fact a complaint's conclusory legal assertions where specific factual allegations do not rise above the speculative level.  *Fowler*, 578 F.3d at 210-11.  The complaint here does not explain what it is that the State Defendants have done to "selectively discriminate" against the plaintiffs (except that they have not, to date, appointed to the Commission a person from the plaintiff's group), nor does the SAC provide any detail why or how the selection process under the statute is irrational.  Rather, the allegations of discriminatory conduct fundamentally are "unadorned, the-defendant[s]-unlawfully-harmed-me accusation[s]."  *Iqbal*, 129 S. Ct. at 1949.  Accordingly, they fail on their face to state actionable Title VI claims.

Finally (and related to the point above), the complaint fails to set forth the manner in which the plaintiffs have been subjected to discrimination "*on the ground* of race, color, or national origin."  42 U.S.C. § 2000d-1 (emphasis added).  Instead, the plaintiffs complain only that their members have not yet been chosen for representation on the Commission.  That fact alone, however, is not discrimination *based on* a protected characteristic.  The plaintiffs take umbrage not at the *reasons* the defendants have thus far failed to secure them representation on the Commission.  Their challenge, instead, is to the end result in itself.  Indeed, the plaintiffs'

---

[27] The plaintiffs intimate in their brief that the statute itself "is discriminatory on its face."  Pl. Opp. to State Br. at 28.  To the extent that the plaintiffs challenge the validity of the statute itself, the Court does not consider the claim, as it appears nowhere in the SAC.  The SAC seeks relief for the defendants' conduct, not the invalidity of the statute.

opposition brief says so expressly: "[T]he State individuals/officials . . . failed to designate plaintiffs as a tribe despite plaintiffs['] repeated requests for consideration." Pl. Opp. to State Br. at 28. This does not meet the *Twombly/Iqbal* burden of alleging specific facts warranting a plausible inference of discriminatory treatment.

Counts 3 and 9 will be dismissed.[28]

**D.     Section 1983 and 1985 Claims**

The Court has already dismissed Count 2 insofar as it asserts claims under 42 U.S.C. §§ 1983 and 1985 against the State of New Jersey, the New Jersey Commission on American Indian Affairs, and the individual State Defendants sued in their official capacities. It now dismisses the remainder of Count 2, i.e., to the extent asserted against the individual State Defendants in their personal capacities.

At the outset, Count 2 fails to allege any specific facts that would permit a plausible inference that any individual State Defendant conspired with one or more of the other individual State Defendants to deprive the plaintiffs of any constitutional protection. *See Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) ("[T]he reach of section 1985(3) is limited to private conspiracies predicated on 'racial, or perhaps otherwise class based, invidiously discriminatory animus.'" (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971))); *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 34 (3d Cir. 1996) ("An actionable section 1985(3) claim must

---

[28] The plaintiffs suggest in their brief that the alleged Title VI violation is also actionable under § 1983. *See* Pl. Opp. Br. at 15. The Court disagrees. *See A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804-05 (3d Cir. 2007) (en banc) (holding that claims under § 504 of the Rehabilitation Act, which "adopts the schemes, rights and remedies" of Title VI, are not also cognizable under § 1983); *M.M.R.-Z. v. Commw. of Puerto Rico*, 528 F.3d 9, 13 n.3 (1st Cir. 2008) ("Section 1983 cannot be used as a vehicle for . . . statutory claims that provide their own frameworks for damages."); *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 856 (7th Cir. 1985) (holding that that the remedial scheme in Title VI is comprehensive, and that Congress consequently did not intend to allow violations of Title VI to be remedied through § 1983); *Bruneau v. S. Kortright Cent. Sch. Dist.*, 163 F.3d 749, 756 (2d Cir. 1998) (holding that Title IX, which is almost identical to Title VI, is similarly comprehensive and does not support claims under § 1983).

allege that (i) the alleged conspirators possessed some racial, or perhaps otherwise class-based, invidiously discriminatory animus, and (ii) their alleged conspiracy was aimed at interfering with rights . . . protected against private, as well as official, encroachment.") (internal citations and quotation marks omitted).  A complaint asserting a § 1985(3) claim will not withstand a Rule 12(b)(6) motion by claiming only that multiple defendants have conspired against the plaintiff. *See Romero-Barcelo*, 75 F.3d at 34 ("The conspiracy allegation must identify an overt act."); *accord Slotnick* v. *Staviskey*, 560 F.2d 31, 33 (1st Cir. 1977) ("Complaints cannot survive a motion to dismiss if they contain conclusory allegations of conspiracy but do not support their claims with references to material facts.").  And Count 2 does nothing more than that.  *See, e.g.*, SAC ¶ 137.  To the extent that the SAC presses a cause of action under 42 U.S.C § 1985(3), therefore, it will be dismissed.

For reasons identical to its dismissal of the plaintiffs' Title VI claim, *supra*, the Court further holds that Count 2 fails to allege a violation of Due Process.  Insofar as the plaintiffs allege that the State Defendants have violated their Fourteenth Amendment rights by refusing to appoint one of their own to the Commission, the plaintiffs have failed to allege what process they were due in the selection of Commission members, and how the defendants withheld the same.

Finally, to the extent the plaintiffs assert a Due Process challenge to the 1802 sale of the Brotherton Reservation, that claim appears to be little more than a recapitulation of the plaintiffs' Nonintercourse Act claim.  *See* SAC ¶ 134 ("American Indians enjoy protected property right[s,] especially in regard to reservation lands.  *At a minimum this includes the right to have the sale or transfer of title to such reservation land reviewed by the Federal Government for sufficiency*.") (emphasis added); *id.* ¶ 139 ("The [defendants] had (and have) fair warning that the confiscation, sale, or disposal of protected Indian lands lies in the sole jurisdiction of the United States

34

government for congressional due process review . . . .")  Alleged violations of a congressional

act, however, may not be recast as constitutional transgressions so easily.  The Court has already

rejected the NIA claims.

In any event, the individual State Defendants are not liable under § 1983 for a simpler,

yet more fundamental reason – the challenged land sale occurred in 1802, two centuries before

the defendants' governmental affiliation.  As the Third Circuit has explained:

> A defendant in a civil rights action must have personal
> involvement in the alleged wrongs; liability cannot be predicated
> solely on the operation of *respondeat superior*.  Personal
> involvement can be shown through allegations of personal
> direction or of actual knowledge and acquiescence.  Allegations of
> participation or actual knowledge and acquiescence, however,
> must be made with appropriate particularity.

*Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1986); *accord Evancho v. Fisher,* 423 F.3d

347, 353 (3d Cir. 2005) (affirming dismissal of § 1983 claim for failing to allege with any detail

the defendant's personal involvement in the challenged actions).  Because the defendants could

not possibly have had anything to do with an early 19th-century land transaction, they cannot be

held personally liable under § 1983 for it.

The SAC fails to establish an actionable § 1983 claim.  Count 2 will therefore be

dismissed.[29]

## E.      Claim Under the Native American Graves Protection and Repatriation Act

The plaintiffs claim in Count 6 that the State and County Defendants have violated the

NAGPRA.  Enacted in 1990, "[t]he NAGPRA establishes rights of tribes and lineal descendants

to obtain repatriation of human remains and cultural items from federal agencies and museums,

---

[29] Count 11 asserts a direct constitutional claim under Articles I and II of the Constitution.  SAC ¶¶ 196-201. This claim assails the defendants' role in the procurement of and transacting in the profits on the land formerly constituting the Brotherton Reservation.  Because this claim is derivative of, and therefore necessarily depends on, the legitimacy of the claims challenging the 1802 land sale, it fails too.  Count 11 is dismissed.

and protects human remains and cultural items found in federal public lands and tribal lands." *Romero v. Becken*, 256 F.3d 349, 354 (5th Cir. 2001); 25 U.S.C. § 3002-3005.

Count 6 avers that the plaintiffs' "unique position as the successor heir of the Delaware, Raritan, and Unami Indians entitles them to all the [r]ights, privileges, benefits[,] and protections of the [NAGPRA]," SAC ¶ 159, and that the defendants "have not complied with this act and its provisions" by "retaining, disturbing, possessing, and refusing to return valuable ancestral remains and cultural artifacts." *Id.* ¶¶ 160-61. Similarly, the SAC's background allegations state only that the County Defendants "are in possession of burial land and artifacts belonging to [them,] in violation of . . . the [NAGPRA]," SAC ¶ 7, and that the County Defendants have "sold, purchased, and acquired lands, burial artifacts[,] and other protected items that belong to [them,] in violation of the [NAGPRA]." SAC ¶ 18. This is insufficient. The SAC provides no specific facts drawing a plausible picture as to what artifacts or remains the defendants have unlawfully disturbed, confiscated, or retained, where such artifacts or remains were discovered, or the manner in which the defendants have violated the acts. Once again, the conclusory allegation that "the defendants have not complied with the Act" does not pass muster.

Additionally, the NAGPRA grants district courts the "authority to issue such orders as may be necessary to enforce [its] provisions," *id.* § 3013, but the statute's reach is limited to "federal or tribal land." *Id.* § 3002(a); *see also Romero*, 256 F.3d at 354. "Federal land" is defined as "any land other than tribal lands which are controlled or owned by the United States[.]" 25 U.S.C. § 3001(5). "Tribal land," in turn, "means . . . (A) all lands within the exterior boundaries of any Indian reservation; (B) all dependent Indian communities; and (C) any lands administered for the benefit of Native Hawaiians pursuant to the Hawaiian Homes Commission Act[.]" 25 U.S.C. § 3001(15). Accordingly, a claim under the NAGPRA fails when

36

the land from which specified remains or artifacts are uncovered is not federal or tribal land.  In

*Romero*, the Court of Appeals for the Fifth Circuit affirmed a Rule 12(b)(6) dismissal of a

NAGPRA claim for this very reason:

> Despite th[e] broad enforcement power [that NAGPRA grants], the
> district court correctly held that [the plaintiff's] claims suffer from
> a fundamental flaw – that the human remains were found on
> *municipal rather than federal or tribal land*.  By its plain terms,
> the reach of the NAGPRA is limited to 'federal or tribal lands.'  25
> U.S.C. § 3002(a).  It is undisputed that the remains in this case
> were found on the land of the City of Universal City.  The fact that
> the U.S. Army Corps of Engineers, a federal agency, was involved
> in a supervisory role with the Texas Antiquities Commission does
> not convert the land into 'federal land' within the meaning of the
> statute.

*Romero*, 256 F.3d at 354 (emphasis added); *see also W. Mohegan Tribe and Nation of N.Y. v.*

*New York*, 100 F. Supp. 2d 122, 125 (N.D.N.Y. 2000) ("NAGPRA governs the disposition of

Native American cultural items that are 'excavated or discovered on federal or tribal lands.' 25

U.S.C. § 3002(a).  As this Court [has] concluded . . . , the Island [on which the items were

alleged to have been discovered] does not fall within the scope of NAGPRA's jurisdiction since

it is neither federal nor tribal land within the statute's meaning."), *vacated in part on other*

*grounds*, 246 F.3d 230 (2d Cir. 2001).

 Here, the plaintiffs have failed to allege that remains or artifacts were discovered and

removed from federal or tribal lands, as defined.  As the NAGPRA claim is asserted against

every defendant, State and County, it is impossible to divine from the conclusory allegations why

or how the land from whence the alleged artifacts came meets those statutorily defined terms.

The land that underlay the 1802 land transaction is not federally owned or controlled, does not

fall within the exterior boundaries of an Indian reservation, and – so far as the factual allegations

in the complaint go – is not a dependant Indian community.[30]  Instead, the plaintiffs allege only that the County Defendants "are in possession of burial land and artifacts belonging to the plaintiff" in violation of NAGPRA and that certain County Defendants "have sold, purchased, and acquired lands, burial artifacts and other protected items that belong to the plaintiff in violation" of the statute.  Accordingly, because plaintiffs have not pleaded facts properly invoking NAGPRA's protection, Count 6 is dismissed.

## F.   1758 Treaty of Easton

The claims based on the 1758 Treaty of Easton – asserted in Counts 7, 8, and 13 – remain.  These claims assert that the defendants have breached the 1758 compact granting the Sand Hill Band plenary authority over the fishing, hunting, and water rights appurtenant to the land formerly constituting the Brotherton Reservation.  Whether one accepts as fact the SAC's historical account of the Treaty of Easton or another version, *see Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. New Jersey*, 867 A.2d 1222, 1224-25 (N.J. Super. Ct. App. Div. 2005) (recounting evolution of the 1758 Treaty of Easton and the 1801 sale of the Brotherton lands), the state-law breach-of-contract claims asserted in Counts 7, 8, and 13 fails for two independent reasons.

First, the Court agrees that the equitable doctrine of laches eviscerates the plaintiffs' right to assert claims under the compact.  This case is, as the State Defendants contend, controlled by *City of Sherrill v. Oneida Indian Nation*, 544 U.S. 197 (2005).  There, the Oneida Indian Nation sought to reestablish Indian sovereignty over lands that once had been subject to Indian control, then subsequently relinquished, and then many years later reacquired by the tribe.  The Supreme

---

[30] *See* 18 U.S.C. § 1151(b); *United States v. South Dakota*, 665 F.2d 837, 839 (8th Cir. 1981).

Court rejected the tribe's re-established sovereignty argument, holding that the doctrine of laches barred it:

> The wrongs of which [the tribe] complains in this action occurred during the early years of the Republic. For the past two centuries, New York and its county and municipal units have continuously governed the territory. The Oneidas did not seek to regain possession of their aboriginal lands by court decree until the 1970's. And not until the 1990's did [the tribe] acquire the properties in question and assert its unification theory to ground its demand for exemption of the parcels from local taxation. This long lapse of time, during which the Oneidas did not seek to revive their sovereign control through equitable relief in court, and the attendant dramatic changes in the character of the properties, preclude [them] from gaining the disruptive remedy it now seeks.

*Id.* at 216-17; *accord Cayuga Indian Nation v. Pataki*, 413 F.3d 266, 277-78 (2d Cir. 2005).

Here, the plaintiffs seek possessory redress for an alleged contractual violation that ripened, at the latest, 208 years ago. The grant of such relief would be disruptive to say the least. As was the case in *Sherrill* and *Cayuga*, much has happened in the interim. As a result of the plaintiffs' "long delay in seeking equitable relief against New [Jersey] or its local units" and the "developments in [the area] spanning several generations," *Sherrill*, 544 U.S. at 221, the Court holds that the doctrine of laches bars their claims.

Second, the Appellate Division of the New Jersey Superior Court rejected precisely this contract claim in *Unalachtigo Band of the Nanticoke Lenni Lenape Nation v. New Jersey*, 867 A.2d 1222 (N.J. Super. Ct. App. Div. 2005). In that case, the plaintiffs asserted the same NIA claims that the plaintiffs in this case assert (based on the same facts), but the Appellate Division held that the NIA grants exclusive jurisdiction to federal courts. 867 A.2d at 1227-30. It went on, however, to address the contractual claim asserted under the Treaty of Easton. And it rejected the claim. *See id.* at 1229-30. The court held that the voluntary sale of the Brotherton

39

Reservation in 1801 (or 1802, according to the plaintiffs) extinguished any contractual rights arising from the 1758 compact:

> In 1801, both parties to the contract agreed, for valuable consideration, to rescind the following two portions of the contract: (1) providing "it shall not be in the power of the said Indians, or their Successors," to sell any part of their interest in the land, and (2) providing that the Commissioners would hold the reservation in trust for the Indians and their successors, forever.
>
> Because the 1758 Act was a contract, under State law the parties may modify, abrogate, or rescind it. Both parties must clearly assent to the change, and consideration is generally required. There is no question here that the Lenni Lenape not only assented to the sale of their land, but requested it, and the record reflects that they received full value, without any deception or overreaching.
>
> When, at the request of the Indians, the land was sold to other parties in fee-simple absolute, the abnormal qualities of Indian tenure were extinguished. The Act of 1801 . . . in effect rescinded the conflicting provisions of the 1758 Act, and modified the land rights associated with the reservation to permit the reservation to be subdivided and sold to non-Indians.
>
> The provisions at issue do not exist any longer; at least under State contract law without considering the impact of the federal Nonintercourse Act. *Only by application of the federal restraint on the 1801 reservation sale, does plaintiffs' specific performance State claim achieve potential viability. In the absence of any federal restraint, plaintiffs would not be entitled to specific performance of the 1758 Act.*

*Id.* at 1231 (emphasis added; internal citations and quotation marks omitted).

The Court has found above that the plaintiffs' NIA claims are not actionable. Accordingly, no "federal restraint" exists to undermine the Appellate Division's contractual analysis of the Treaty of Easton. Whether or not the Appellate Division's holding is binding on this Court, *see* State Def. Br. at 40, the Court agrees with it. Accordingly, the claims based on the Treaty of Easton fail.

G.      **Summary**

The following is a summary of the Court's disposition.  Counts 1 and 4 – asserting claims arising directly out of the Constitution – have been dismissed because § 1983 is the exclusive vehicle for achieving redress against a state officer for constitutional deprivations. (Alternatively, those counts are subsumed by Count 2, and fail on their merits.)  Count 2 – asserting claims under §§ 1983 and 1985 – has been dismissed for two essential reasons:  (1) to the extent it is asserted against the State of New Jersey, the New Jersey Commission on American Indian Affairs, and the individual State Defendants in their official capacities, those defendants are not "persons" under the statute and cannot be held liable; and (2) to the extent it is asserted against the individual State Defendants in their personal capacities, Count 2 fails to set forth sufficient factual allegations permitting a plausible inference that the defendants have violated the plaintiffs' federal constitutional or statutory rights.  Counts 3 and 9 – asserting claims under Title VI – fail for similar reasons, and also because individual persons cannot be held liable under the statute.

Counts 5, 7, 8, 11, 14, and 15 assert claims and seek relief under the Nonintercourse Act, challenging the 1802 sale of the land formerly constituting the Brotherton Reservation.  Those counts assert claims against the State of New Jersey and one of its agencies, and are accordingly barred by the Eleventh Amendment.  Alternatively, even if they were not barred, the Court would defer to the primary jurisdiction of the Bureau of Indian Affairs to make complex determinations regarding the plaintiffs' ancestral lineage.

Count 6, asserted against all defendants, fails because the SAC does not set forth sufficient factual matter to permit a plausible inference that the defendants have violated the NAGPRA.  The remaining portion of Count 6 has been withdrawn by the plaintiffs.

Counts 10 and 12 have been withdrawn by the plaintiffs.  Finally, Counts 7, 8, and 13 – asserting contract claims under the Treaty of Easton – are dismissed under the equitable doctrine of laches and on their merits.

## H.     Housekeeping

Two issues remain.  First, the SAC makes reference to alleged violations of the New Jersey Constitution, although it does not allege them as independent counts.  *See, e.g.*, SAC ¶ 118.  This Court has dismissed all claims underlying its original federal-question jurisdiction, and has addressed one state-law claim, as it is intertwined with the federal claims.  To the extent that the SAC can be read to assert independent state-law claims arising under the New Jersey Constitution, however, the Court will decline to exercise supplemental jurisdiction over them. *See* 28 U.S.C. § 1367(c); *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 129 S. Ct. 1862, 1866 (2009) ("With respect to supplemental jurisdiction . . . , a federal court has subject-matter jurisdiction over specified state-law claims, which it may (or may not) choose to exercise.  A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.") (internal citation omitted).

Second, on June 16, 2010, the plaintiffs filed a motion [D.E. 168] to amend the complaint, seeking to file a Third Amended Complaint.  Pursuant to her earlier case management order [D.E. 165], Magistrate Judge Shwartz terminated the motion to amend without prejudice pending the disposition of the motions to dismiss [D.E. 173].  Pursuant to that order, and in accord with Fed. R. Civ. P. 15(a)(2), the plaintiffs will be permitted to re-file their motion to amend.  The parties are directed to confer with Judge Shwartz no later than July 9, 2010 for specific instructions regarding motion practice.

## V. CONCLUSION

For the foregoing reasons, the Court grants the motions to dismiss the Second Amended Complaint.


/s/  Katharine S. Hayden

KATHARINE S. HAYDEN
UNITED STATES DISTRICT JUDGE

DATE: JUNE 30, 2010